IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | 07 CR 846 |
| v. | ) | |
| | ) | Judge Virginia M. Kendall |
| MONIQUE ELLINGTON | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Defendant Monique Ellington ("Ellington") moves this Court to suppress statements she made at the Federal Bureau of Investigation ("FBI") building on December 14, 2007. This Court held a suppression hearing on August 25 and permitted the Government to supplement that hearing on October 24, 2008 to determine whether the FBI subjected Ellington to custodial interrogation and whether Ellington requested the presence of an attorney. For the reasons stated, Ellington's Motion to Suppress is denied.

## BACKGROUND

On the morning of December 14, 2007, FBI Special Agent Nikkole Robertson ("Robertson") responded to reports of a bank robbery at Diamond Bank ("Diamond") located at 100 West North Avenue in Chicago, Illinois. (8/25/08 Tr. 13.)[1] When she arrived Robertson learned that the bank robber entered the bank and handed Ellington, a teller at Diamond, a note demanding the money in her teller drawer. (Hrg. Tr. 14.) As a result of the robbery, Diamond lost approximately $17,000, an unusually high amount because normally Diamond's tellers close their drawers at the end of each day with approximately $8,500 in cash and Robertson learned that no customers had come to

---

[1] References to the August 25, 2008 hearing have been abbreviated to "Hrg. Tr. __." References to the October 24, 2008 supplemental hearing have been abbreviated to "Supp. Hrg. Tr. __."

1

Ellington's window before the robbery. (*Id.*)

As part of her investigation, Robertson interviewed Ellington inside an office at Diamond at 9:30 a.m. (Hrg. Tr. 15; Gov't Ex. F) When Robertson informed Ellington that the robbers used her car to commit the robbery, Ellington said that her boyfriend, Willie Perkins ("Perkins"), drops her off at Diamond in the morning and uses her car during the day. (Hrg. Tr. 16.) Ellington suggested that Perkins could have loaned the vehicle to someone after he dropped her off at the bank that day. (*Id.*) After the interview, Robertson asked Ellington if she would come to the FBI office to take a polygraph exam and make some recorded phone calls in an attempt to contact Perkins and figure out where her car was. (*Id.*) Ellington agreed. (*Id.*)

Chicago Police Department Detective Michael Frasier drove Sergeant Ken Ables, Robertson and Ellington to the FBI office. (Hrg. Tr. 16-17.) Before Ellington entered Frasier's car, Robertson did not handcuff or pat down Ellington. (Hrg. Tr. 16.) At 11:40 a.m., Frasier drove the car through the security check-point into the FBI building's garage. (Hrg. Tr. 19-20.) Frasier, Ables, Robertson and Ellington used the main elevator bank and went to the Violent Crimes Task Force workspace on the building's fourth floor. (*Id.*) At 11:45 a.m., Robertson offered Ellington a drink and use of the restroom facilities. (Hrg. Tr. 20-21; Gov't Ex. F.) After she declined a drink and used the restroom facilities, Ellington entered Ables' office and signed Form FD472 which gave the FBI consent to record her conversations with Perkins on December 14, 2007. (Hrg. Tr. 21; Gov't Ex. F.) At 12:04 a.m., using her personal cell phone, Ellington attempted to call Perkins from Ables' office, but the call went to an answering machine. (Hrg. Tr. 22-23; Gov't Ex. F.)

After the phone call to Perkins, at 12:10 p.m., Ellington agreed to take a polygraph examination regarding her knowledge of the bank robbery. (Hrg. Tr. 24; Gov't Ex. F.) To schedule

2

the polygraph exam for that afternoon, Robertson contacted FBI Special Agent Bruce Rather, a polygrapher. (Hrg. Tr. 24.) Robertson escorted Ellington to Rather's office on the first floor of the building. (*Id.*) Ellington was not handcuffed at the time and brought her personal belongings with her, including her purse and cell phone. (Hrg. Tr. 25, 97-98.) When they reached Rather's office, Robertson left Ellington unattended in the waiting area adjacent to the polygraph examination rooms for a few minutes so that Robertson could inform Rather of the situation. (Hrg. Tr. 24-25, 97-98.) Rather testified that if Ellington had been a suspect at that point, she would have been handcuffed and the FBI would have an escort at her side while he spoke with Robertson. (Hrg. Tr. 98-99.)

During their conversation, Robertson told Rather that a bank robbery had occurred at Diamond and that Ellington had been the victim teller at the bank. (Hrg. Tr. 97-98.) At approximately 12:15 p.m., FBI Special Agent Nikki Ruddy arrived at the polygraph area to accompany Ellington because FBI policy prohibits unescorted guests inside the building. (Supp. Hrg. Tr. 9.) At that time, Ruddy offered Ellington a drink and use of the restrooms, but Ellington declined. (*Id.*; Gov't Ex. F.) Ruddy then showed Ellington a locker inside the polygraph where she could secure her purse and cell phone because the FBI prohibits cell phone use during polygraph examinations. (Supp. Hrg. Tr. 10; Hrg. Tr. 115.) At approximately 1:00 p.m., Robertson finished briefing Rather and returned to her squad area, leaving Ellington with Ruddy while Rather set up the equipment for the polygraph exam. (Hrg. Tr. 25, 100.)

Rather brought Ellington into his office to begin the polygraph exam at 1:45 p.m. (Hrg. Tr. 100.) Ruddy returned to her squad area on the fourth floor at that time, leaving the polygraph area unguarded. (Supp. Hrg. Tr. 11; Hrg. Tr. 101.) Rather explained to Ellington how he conducts polygraph examinations, giving her an overview of what to expect. (Hrg. Tr. 102.) He then asked

3

her questions about her background, including her address, work history, salary, drug use, alcohol use and marital status. (*Id.*) After those questions, he moved his chair beside hers so he could read and explain the "Consent to Interview with Polygraph" form to her. (*Id.*) Using the form, he explained to her that the polygraph exam was voluntary, that she had the right to refuse the test, stop the test at any time or refuse to answer any individual question. (Hrg. Tr. 105.) In response, Ellington said that she understood that the polygraph exam was voluntary and she signed the "Consent to Interview with Polygraph" form. (Hrg. Tr. 106.)

After Ellington signed the form, but before Rather hooked her up to the polygraph machine, as part of his background interview, Rather explained what he knew about the circumstances of the robbery, allowing her to make corrections. (*Id.*) He then asked her if she had participated in the robbery or had any knowledge that it was going to occur. (Hrg. Tr. 107.) Ellington responded that she did not. (*Id.*) When Rather concluded his background interview he once again sat next to Ellington to advise her of her rights using form FD 395, an Advice of Rights form. (Hrg. Tr. 108-09.) When he finished reading the FD 395 form to her, Rather asked Ellington if she wished to have an attorney present and if she wanted to continue the polygraph exam. (Hrg. Tr. 110.) Ellington responded that she did not wish to have an attorney present, and that she would like to continue the examination, but she would like to call her mother, Patricia Ellington-Hill ("Ellington-Hill") before she continued. (*Id.*) Ellington did not sign the FD 395 form. (Hrg. Tr. 168.) Rather took Ellington to a vacant workspace within the polygraph examination area, dialed the phone number Ellington provided, handed her the phone and left the room to return to his office. (Hrg. Tr. 111-12.)

At 2:01 p.m., Ellington spoke to Ellington-Hill for approximately a minute and a half. (Gov't Ex. L at 8.) According to Ellington, Ellington told her mother that the FBI asked her to take

4

a polygraph test and her mother told her she thought that Ellington should have an attorney present before taking the exam. (Hrg. Tr. 170.) Ellington testified that after the phone call to her mother, she told Rather that she "shouldn't be doing anything without having an attorney" and that she "need[s] to have one in order to continue with this exam." (Hrg. Tr. 170-71.) Rather later testified that she never mentioned anything about an attorney. (Hrg. Tr. 118.) Ellington then told Rather that she would be willing to come back and take the polygraph exam either over the weekend or the following Monday. (Hrg. Tr. 171.) According to Ellington, she only made one phone call to her mother from the polygraph area and that once she asked for an attorney, Rather contacted Robertson to inform her that Ellington refused to take the test. (Hrg. Tr. 171, 192-93.) Robertson then came downstairs to escort Ellington out of the polygraph exam area. (Hrg. Tr. 171.) According to Ellington, when Robertson arrived at the polygraph exam area, Ellington told her "I just feel like I need to have an attorney present in order to do anything at this point." (Hrg. Tr. 171-72.) Ellington and Robertson then left to take elimination fingerprints. (Hrg. Tr. 172.)

In contrast, Rather testified that after Ellington spoke on the phone with her mother, she exited the vacant workspace and told Rather that her mother was going to attempt to reach a family friend who worked in "law enforcement" and would call Ellington back in ten to fifteen minutes. (Hrg. Tr. 112.) After ten minutes had passed, Rather suggested that Ellington call her mother once again. (*Id.*) Rather stated that he led her back to the vacant workspace within the polygraph exam area, dialed the number for her mother, handed the receiver to Ellington and stepped out of the area to give her some privacy. (Hrg. Tr. 113.) Rather said that this second phone call to Ellington's mother lasted a few minutes. (*Id.*) After the call concluded, at 2:46 p.m., Ellington told Rather that she did not want to take the test at that time because her family friend in law enforcement advised

5

"that if she did not take the test, she might still be considered a suspect, in the future, but that she could take it at another time." (Hrg. Tr. 113-14.) Rather testified that Ellington did not tell him that she wanted to have a lawyer present at the exam or that she would not take the exam because she wanted to talk to her lawyer. (Hrg. Tr. 114.) Rather stated that when Ellington refused to take the exam, he called Robertson to inform her of the situation. (*Id.*) While waiting for Robertson to arrive in the polygraph area, Rather spoke with Ellington about taking the exam another time. (Hrg. Tr. 117.) During that conversation, Ellington said that she wanted to confer with Perkins before she took the test because she wanted to know if he had anything to do with the bank robbery. (*Id.*) Again, Rather testified that Ellington never mentioned her attorney during his time with her in the polygraph area. (Hrg. Tr. 118.) During the evening of December 14, 2007, Rather prepared a report of his encounter with Ellington. (Hrg. Tr. 116-17.) In the report, Rather documented that Ellington declined to take the polygraph exam at that time because she wanted to speak with Perkins to determine his involvement before taking the exam. (Gov't Ex. G.) Rather also wrote "[a]t no time during the conversation between [Rather] and [Ellington] did [Ellington] ever invoke her right to silence, ask for an attorney, or state that she no longer wished to take the polygraph examination." (*Id.*)

Robertson and Ruddy arrived in the polygraph area shortly after they learned that Ellington had refused to take the polygraph exam. (Hrg. Tr. 28; Supp. Hrg. Tr. 28-29.) Robertson entered Rather's office to have a brief conversation with him while Ruddy remained in the polygraph waiting area with Ellington. (Hrg. Tr. 26; Supp. Hrg. Tr. 28-29.) Rather informed Robertson that Ellington changed her mind about taking the polygraph exam after speaking with her mother. (Hrg. Tr. 26.) Robertson asked Rather if Ellington asked for a lawyer, and Rather responded that she did

not. (*Id.*) Ruddy testified that when she sat next to Ellington in the polygraph waiting area, Ellington had her purse and cell phone with her and she did not have handcuffs on. (Supp. Hrg. Tr. 28.) While Ruddy and Ellington waited for Robertson to return from Rather's office, Ruddy testified that Ellington began thinking out loud. (Supp. Hrg. Tr. 31.) Ruddy stated that there was no conversation or dialog between her and Ellington during this time; instead, Ellington made a "continuous stream of verbalizations that in no way was directed at [Ruddy] but more . . . at the wall and the ceiling or maybe the situation. And [Ruddy] simply sat with her and did not respond to anything she said." (Supp. Hrg. Tr. 32.) During this time, Ellington rocked back and forth on her chair while looking at the wall and ceiling, making comments such as, "I can't believe he would do this," "he can't have any part of this," "I need to take that polygraph–I'm going to take it," and "I don't know if I'm going to need to get a lawyer." (Supp. Hrg. Tr. 31-32.) Ruddy never responded to her. (*Id.*) Ruddy testified that Ellington only used the word "lawyer" once while they sat in the polygraph area. (Supp. Hrg. Tr. 32.)

When Robertson returned from Rather's office, she accompanied Ellington and Ruddy to another area within the FBI building to have Ellington's fingerprints taken. (Hrg. Tr. 27.) Robertson testified that she wanted to obtain elimination fingerprints because it appeared that only two people had handled the note at the bank–Ellington and the robber. (Hrg. Tr. 28.) Using the process of elimination, if the FBI knew Ellington's fingerprint pattern, it could isolate the robber's fingerprints on the note. (*Id.*). Ellington testified that as they walked from the polygraph area to the fingerprinting area, she told Robertson that she expected her mother to call her back with her attorney's information and that she needed to have an attorney present before she could do anything. (Hrg. Tr. 172-74.) Robertson testified that Ellington did not say anything about a lawyer to her

7

while they went to get the fingerprints taken. (Hrg. Tr. 29.) Ellington had her fingerprints taken at 2:50 p.m. and Robertson asked her if she would be willing to make any more phone calls to Perkins. (Gov't Ex. F.; Hrg. Tr. 30.) Ellington indicated that she would attempt to contact Perkins again. (Hrg. Tr. 30.) Robertson testified that if Ellington did not want to make more phone calls, she would have driven Ellington back to the bank or wherever else she needed to go. (*Id.*) Because Ellington agreed to make more phone calls, Robertson, Ruddy and Ellington returned to Ables' office on the fourth floor of the FBI building via the main elevator bank. (Hrg. Tr. 31.) Ellington did not have handcuffs on. (*Id.*)

When Robertson, Ruddy and Ellington returned to the fourth floor, Ellington attempted to make a phone call to Perkins at 3:12 p.m., but could not reach him. (Hrg. Tr. 31; Gov't Ex. F.) From 3:14 p.m. through 3:24 p.m., Ellington tried to locate Perkins by calling people in her cell phone's contact list who might know Perkins' location. (Hrg. Tr. 32; Gov't Ex. F.) During that time, Ellington called Perkins' friends "Lil G," "Black," "Butter," Joe, Jerry and Perkins' Aunt Alice. (*Id.*) While Ellington made the phone calls, Ruddy and Robertson left Ellington unattended in Ables' office for brief periods of time. (Hrg. Tr. 32.) Robertson testified that as Ellington made the phone calls, she became convinced that Ellington was not involved in the bank robbery, based on the level of her cooperation with the FBI. (Hrg. Tr. 32-33.) Robertson stated that Ellington "was generally trying to make an effort to provide that she had nothing to do with the robbery." (Hrg. Tr. 33.) At 3:41 p.m., Ellington received a phone call from Perkins, which the FBI recorded with Ellington's consent. (*Id.*; Gov't Ex. F.) During the phone call, Perkins told Ellington that he let his friend Nick borrow Ellington's car for the day. (Hrg. Tr. 34.) Ellington became upset and yelled at Perkins, "This is going to cost me my job you know. You've got to clear my name . . . . My

8

name's in on this." (8/28/04 Tr. 34-35.)  After that conversation, Robertson stated that she thought Ellington "may have been an innocent party at [that] point."  (8/28/04 Tr. 34.)  Robertson believed that Nick had robbed the bank.  (Hrg. Tr. 38.)

When the conversation between Ellington and Perkins concluded, Ruddy offered Ellington food and a drink at 4:00 p.m.  (Supp. Hrg. Tr. 38; Gov't Ex. F.)  Ellington declined the food, stating that she was not hungry, but she accepted a Pepsi.  (Supp. Hrg. Tr. 38.)  At 4:08 p.m. Ellington placed another phone call to Perkins that the FBI recorded.  (8/24/08 Tr. 36; Gov't Ex. F.)  During that phone call, Perkins told Ellington that he made contact with Nick and that he was going to recover the money from the bank robbery.  (8/24/08 Tr. 37.)  At 4:47 p.m., Ellington attempted to call Perkins at his residence, but Perkins' sister informed Ellington that Perkins had left the residence in Ellington's car.  (Supp. Hrg. Tr. 40-41; Gov't Ex. F.)  After Ellington made these phone calls, Robertson showed Ellington various photographs in an attempt to identify Perkins' friend Nick.  (8/24/08 Tr. 37.)

During this time, Robertson and Ruddy were waiting to hear from Perkins to see if he found the money from the bank robbery.  (Supp. Hrg. Tr. 41.)  To pass the time, Robertson made small-talk with Ellington for a few hours in Ables' office.  (Hrg. Tr. 38.)  During this time, Ellington did not ask for a lawyer.  (*Id.*)  While waiting to hear back from Perkins, Ellington, Robertson and Ruddy walked around the FBI office in an attempt to find food.  (Supp. Hrg. Tr. 41; Hrg. Tr. 44.)  The FBI held its Christmas party on that day, so Robertson and Ruddy escorted Ellington to various floors within the FBI office that had been designated "food floors" during the party.  (8/24/08 Tr. 39; Supp. Hrg. Tr. 41.)  The party had broken up before they began looking for food, so they could only find leftover cookies.  (*Id.*)  During this time, Ruddy escorted Ellington to her squad area to show her the

9

workspace and to show her photographs of her husband. (Supp. Hrg. Tr. 41.) When Robertson, Ruddy and Ellington walked around the FBI building, Ellington did not wear handcuffs nor was she restrained in any way. (Supp. Hrg. Tr. 42.) At approximately 6:30 p.m., Ellington placed a phone call to her mother. (Hrg. Tr. 44; Gov't Ex. F.) Ellington ate some of the leftover cookies from the FBI Christmas party at approximately 7:00 p.m. (Gov't Ex. F.) At approximately 7:36 p.m., Ellington-Hill called the FBI's main phone number. (Supp. Hrg. Tr. 50.) The FBI radio room personnel paged Ellington over the building's intercom system. (Supp. Hrg. Tr. 50-51.) Ruddy escorted Ellington to the radio room, where Ellington spoke with her mother for a few minutes. (Supp. Hrg. Tr. 51.) At approximately 8:15 p.m., Ellington accepted a cigarette from Ruddy. (Supp. Hrg. Tr. 42.) Ruddy accompanied Ellington outside while she smoked the cigarette. (Supp. Hrg. Tr. 42; Gov't Ex. F.) When Ellington finished smoking, Ruddy escorted her to the ninth floor to locate more leftover food from the office Christmas party. (Supp. Hrg. Tr. 42.) At 8:30 p.m., the FBI provided Ellington with a hamburger and fries from a fast food restaurant. (Supp. Hrg. Tr. 45.)

Around that time, Robertson received a phone call from FBI Special Agent Thomas Weber who had conducted surveillance on the vehicle used to rob the bank. (Hrg. Tr. 46, 209.) Weber informed Robertson that he had taken Perkins into custody and that Perkins claimed that Ellington was involved in the bank robbery. (Hrg. Tr. 46, 212-13.) In response, Robertson contacted Ruddy, who was with Ellington on the ninth floor of the FBI building. (Hrg. Tr. 46; Supp. Hrg. Tr. 53.) At that point, Robertson and Ruddy considered Ellington a suspect in the bank robbery. (*Id.*) Ruddy immediately took Ellington to the FBI's booking area on the first floor. (Supp. Hrg. Tr. 53.) At 9:13 p.m., Ruddy and Weber began an interview of Ellington by reading her *Miranda* rights to her. (Hrg. Tr. 214; Supp. Hrg. Tr. 53-54; Gov't Ex. F.) Ellington signed a *Miranda* waiver at 9:15 p.m.

10

and made statements that implicated herself in the Diamond Bank robbery during the course of the interrogation. (Hrg. Tr. 214-16; Supp. Hrg. Tr. 54-55.) After the interview with Weber and Ruddy, the FBI booked and processed Ellington at 10:45 p.m. (Gov't Ex. F.)

Before participating in the interview with Weber and Ruddy, Ellington had not made any statements on December 14, 2007 that had implicated herself in the bank robbery. (Hrg. Tr. 206-07; Supp. Hrg. Tr. 54.) On May 30, 2008, Ellington submitted an affidavit in which she stated that: 1) she informed Rather that she "did not want to do anything without [her] attorney being present" after she spoke with her mother on the phone; 2) she told Robertson that she "did not want to do anything without [her] attorney being present" after refusing to take the polygraph exam; and 3) she did not feel free to leave the FBI office after she refused to take the polygraph exam. The Court held a suppression hearing on August 25 and a supplemental hearing on October 24, 2008 to determine whether the FBI subjected Ellington to custodial interrogation and whether Ellington invoked her *Miranda* right to counsel.

## DISCUSSION

"[A] suspect subject to custodial interrogation has the right to consult with an attorney and to have counsel present during questioning, and . . . the police must explain this right to him before questioning begins." *Davis v. United States*, 512 U.S. 452, 457 (1994); *see also Miranda v. Arizona*, 384 U.S. 436, 469-473 (1966). "The *Miranda* right to counsel ensures that a person under arrest has access to legal counsel during custodial interrogations." *United States v. Muick*, 167 F.3d 1162, 1165 (7th Cir. 1999) (*citing Edwards v. Arizona*, 451 U.S. 477 (1981)). "[A] suspect must be both in custody and subject to interrogation to trigger the *Miranda* warnings requirement." *United States v. Salyers*, 160 F.3d 1152, 1159 (7th Cir. 1998). "If a suspect invokes his right to counsel under

11

*Miranda*, he is not subject to further interrogation until counsel is present or until the suspect himself initiates further discussions." *United States v. McKinley*, 84 F.3d 904, 908 (7th Cir. 1996).

"Whether a person is in custody depends on the totality of the circumstances, the ultimate inquiry being whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *Sprosty v. Buchler*, 79 F.3d 635, 640 (7th Cir. 1996). An individual is only in custody if a reasonable person would have believed he was not free to leave under the circumstances. *See Salyers*, 160 F.3d at 1159. In applying the totality of the circumstances test, courts consider "whether the encounter occurred in a public place; whether the suspect consented to speak with the officers; whether the officers informed the individual that he was not under arrest and was free to leave; whether the individual was moved to another area; whether there was a threatening presence of several officers and a display of weapons or physical force; and whether the officers' tone of voice was such that their requests were likely to be denied." *United States v. Thompson*, 496 F.3d 807, 810-11 (7th Cir. 2007).

When law enforcement officials transport someone from a public location to a law enforcement building, they do not necessarily take that person into custody. *See United States v. Jones*, 21 F.3d 165, 170 (7th Cir. 1994) (finding suspect was not in police custody when he voluntarily agreed to have officers drive him to police headquarters, remained unhandcuffed at all times in the building, participated in questioning by two or three officers in an unlocked room and was told that he was not under arrest and was free to leave). Here, as in *Jones*, Ellington voluntarily accepted a ride to the FBI building from Frasier, Ables and Robertson. Although FBI agents never told Ellington that she was not under arrest or free to leave the building, she never wore handcuffs as she moved around the building using the main elevator bank rather than the freight elevator

12

typically used to transport suspects in custody.  She participated in the beginning phases of the polygraph exam with Rather in an unlocked, unguarded polygraph suite.  After she refused to take the polygraph exam, Robertson once again asked her if she would be willing to make more phone calls in an attempt to locate Perkins.  Once again, Ellington agreed.

Although Robertson or Ruddy escorted Ellington around the building that day, she moved freely between secure areas of the building to find food and answer phone calls.  Ellington spent most of the day near Robertson's workspace instead of the booking area's interrogation rooms.  Additionally, the record shows that FBI agents acted friendly towards Ellington during her time inside the buildings.  Robertson and Ruddy escorted Ellington around various floors of the building in an attempt to feed her leftover food from the office Christmas party and spent considerable amounts of time making small talk and sharing family photographs with Ellington.  Once Robertson and Ruddy became aware that Perkins had implicated Ellington in the robbery, they immediately rushed Ellington to the booking area and placed her in a small interrogation room.  Based on the totality of circumstances, a reasonable person would have felt free to leave the FBI building when he voluntarily accepted a ride to the building from FBI agents, voluntarily assisted the FBI make contact with a suspect, remained unhandcuffed for over eight hours, moved freely around the FBI workspace with an escort and spent considerable time with FBI agents making small talk and viewing family photographs while sharing cookies from the office Christmas party.  The totality of circumstances shows that until Robertson and Ruddy became aware of Ellington's potential involvement in the robbery at approximately 8:30 p.m., Ellington did not experience a restraint on her freedom of movement to the degree associated with a formal arrest.  Therefore, until approximately 8:30 p.m., Ellington was not in the FBI's custody on December 14, 2007.

13

Even if Ellington had been in custody, the Court must determine whether Ellington invoked her right to counsel under *Miranda* while at the FBI building on December 14, 2007. In her affidavit and in her testimony during the suppression hearing, Ellington stated that she informed Rather of her desire to have an attorney present. Ellington testified that when she told Rather that she did not want to take the polygraph exam that day, she also told him "I don't have an attorney present. I need to have one in order to continue with this exam." (Hrg. Tr. 170-71.) The fact that Ellington never signed the waiver of rights form that Rather offered her provides some support for her contention that she stopped the interview by invoking her right to counsel. In contrast, Rather testified that Ellington never mentioned an attorney in his presence. (Hrg. Tr. 118.) That evening, before he learned that Perkins implicated Ellington in the robbery, Rather created a report of his interaction with Ellington that specifically stated "[a]t no time during the conversation between writer and the examinee did the examinee ever invoke her right to silence, ask for an attorney, or state that she no longer wished to take the polygraph examination." (Gov't Ex. G.) Rather's report also indicated that Ellington ended the polygraph examination that day after hearing her mother relay advice from a family friend in law enforcement. (*Id.*)

Agent Rather was a credible witness and was not impeached on cross examination. Further, the documentary evidence submitted to the Court corroborates Rather's testimony. While Rather testified that he allowed Ellington to make two phone calls to her mother before she ended the interview, Ellington testified that she only made one phone call. An analysis of Ellington-Hill's phone call detail corroborates Rather's testimony that Ellington made two phone calls to her mother before ending the interview because two connected phone calls to Ellington-Hill originated from the FBI building during the time that Ellington was in the polygraph area. (Gov't Ex. L at 8.) Between

14

the phone calls with Ellington, Ellington-Hill placed a lengthy call to Andre Carter ("Carter"), a corrections officer in Will County, Illinois. (*Id.*; Supp. Hrg. Tr. 27.) The phone records corroborate Rather's testimony that Ellington told him that she spoke with her mother twice from the polygraph area and that her mother was going to see the advice of a family friend in law enforcement. This corroborated testimony, in contrast to the self-serving statements of the defendant, supports the conclusion that Ellington did not inform Rather that she desired to have an attorney present and that she ended the polygraph examination by telling Rather that she wanted to determine Perkins' involvement in the robbery before taking the polygraph examination.

Ellington also testified that she informed Robertson of her desire to have an attorney present by stating, "I just feel like I need to have an attorney present in order to do anything at this point" when Robertson and Ruddy escorted her from the polygraph area to the fingerprinting area within the FBI building. (Hrg. Tr. 172.) Robertson testified that Ellington cooperated with the agents after she refused to take the polygraph exam in an attempt to clear her name and that she never asked Robertson for a lawyer. (Hrg. Tr. 28-29.) Robertson further stated that Ellington informed her that Ellington changed her mind about testifying after her mother relayed information from their family friend in law enforcement. (Hrg. Tr. 26.) Ruddy also testified that Ellington did not request the presence of an attorney during the walk to the fingerprint area. (Supp. Hrg. Tr. 32.) Robertson and Ruddy corroborate each other's testimony and Robertson's testimony is consistent with the phone call that Ellington-Hill made to Carter, the corrections officer. Furthermore, because Ellington testified falsely about the number of phone conversations she had with her mother from the polygraph area, her testimony is not as credible as the testimony of Robertson and Ruddy. Therefore, the Court finds that Ellington did not inform Robertson or Ruddy of her desire to have

an attorney present during the walk from the polygraph area to the fingerprinting area.

The only other time that Ellington mentioned the words "lawyer" or "attorney" while at the FBI office on December 14, 2007 occurred when Ruddy sat alone with Ellington outside of the polygraph area before going to the fingerprinting area. Although Ellington did not mention this time period during her testimony, Ruddy testified that Ellington began thinking out loud while they waited for Robertson to return from a conversation held in Rather's office. (Supp. Hrg. Tr. 31-32.) During that brief period, Ruddy stated that Ellington began rocking back and forth in the chairs outside of the polygraph area, alternating between saying "I can't believe that he would do this," "he can't have any part of this," and "I can't believe he would do this to me." (Supp. Hrg. Tr. 31.) Ruddy did not respond to Ellington while she made those statements or otherwise engage in conversation with her. (Supp. Hrg. Tr. 32.) While Ellington continued her "stream of verbalizations . . . directed at . . . the wall and the ceiling or maybe the situation," at one point Ellington said, "I don't know if I'm going to need to get a lawyer." (*Id.*)

If a suspect requests counsel during an interrogation, "he is not subject to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation." *Davis*, 512 U.S. at 458. "If the suspect effectively waives his right to counsel after receiving the *Miranda* warnings, law enforcement officers are free to question him." *Id.* (*citing North Carolina v. Butler*, 441 U.S. 369, 372-76 (1979)). Invocation of the *Miranda* right to counsel "requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney." *McNeil v. Wisconsin*, 501 U.S. 171, 178 (1991). Therefore,"[a] defendant must unambiguously request the assistance of counsel in order to invoke his right to an attorney under *Miranda . . . ." United States v. Muhammad*, 120 F.3d 688, 689 (7th Cir. 1997); *see also Smith v.*

16

*Illinois*, 469 U.S. 91, 97-98 (1984) (per curium) ("[A] statement either is such an assertion of the right to counsel or it is not."). To property invoke *Miranda's* right to counsel, the suspect "must articulate his desire to have counsel present sufficiently clearly that a reasonable officer in the circumstances would understand the statement to be a request for an attorney. If the statement fails to meet the requisite level of clarity, *Edwards* does not require that the officers stop questioning the suspect." *Davis*, 512 U.S. at 459. Furthermore, when a suspect makes an ambiguous statement about his desire for counsel during interrogation, "an officer has no obligation to clarify the ambiguous statement by the accused." *Muhammad,* 120 F.3d at 698.

While at the FBI building on December 14, 2007, Ellington only made one reference to obtaining counsel when she said "I don't know if I'm going to need to get a lawyer" to herself while in Ruddy's presence. In *Davis*, the statement "Maybe I should talk to a lawyer" was not an unambiguous request for counsel. *See Davis*, 512 U.S. at 462. Ellington's reference to a lawyer therefore did not constitute invocation of her *Miranda* right to counsel because Ruddy could not have reasonably understood Ellington's ramblings to herself to be a request for an attorney. When Ruddy heard Ellington make that comment, she had no duty to clarify with Ellington whether she wanted an attorney present. Because Ellington did not invoke her right to counsel by unambiguously requesting the presence of counsel, any questioning of her that had occurred up until that point was permissible. After Robertson and Ruddy became aware that Perkins had implicated Ellington in the Diamond Bank robbery, Ellington received a new set of *Miranda* warnings and executed a waiver of those rights with Weber and Ruddy. Therefore, she effectively waived her right to counsel before making the incriminating statement that she seeks to suppress. Accordingly, Ellington is not entitled to suppress the statements that she made at the FBI building on

December 14, 2007.

## **CONCLUSION AND ORDER**

For the reasons stated, Ellington's Motion to Suppress is denied.

So ordered.

_____
Virginia M. Kendall, United States District Judge
Northern District of Illinois

Date: November 18, 2008